Doris J. BAUERS, Appellant,

v.

Bruce C. CORNETT, individually and in his official capacity as Director of the Division of Employment Security, Dept. of Labor & Industrial Relations and John F. Meystrick, individually and in his official capacity as Assistant Director of Field Operations, Division of Employment Security, Dept. of Labor & Industrial Relations, Appellees.

No. 87–1752.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1988.

Decided Jan. 23, 1989.

Michael P. Bastian, St. Louis, Mo., for appellant.

Michael L. Boicourt, Asst. Atty. Gen., Jefferson City, Mo., for appellees.

Before HEANEY and JOHN R. GIBSON, Circuit Judges, and HARPER,* Senior District Judge.

HEANEY, Circuit Judge.

Doris Bauers posted flyers at her government workplace. The flyers primarily informed her fellow employees about legislation affecting their interests as employees. She sought donations for a fund to pay for a lobbyist and she also indicated that some money might be donated to legislators who favored employee rights. Her employer ordered the flyers removed because their contents allegedly violated laws designed to protect government employees from solicitation for partisan political purposes. Bauers asked the district court to enjoin her employer from removing further flyers, and she sought a declaratory judgment establishing her rights at the workplace. The district court denied her request for injunctive relief. We agree with the district court that Bauers' request for funds to be used in partisan political races is not protected speech. We reverse in part, however, because the district court erred in stating that solicitation for nonpartisan lobbying is also a violation of law. We remand for consideration of whether Mrs. Bauers may make some solicitations at the worksite.

FACTS

Doris Bauers has been an employee of the Missouri Division of Employment Security (Unemployment Office) since 1951. She is an active member of the International Association of Personnel for Employment Service (IAPES), a national organization of state government employees. In 1984, IAPES discontinued lobbying before the Missouri Legislature. Bauers and others subsequently formed the "DES Lobbyist Committee" (Committee), after learning that legislation had been passed adversely affecting their interests as employees. The Committee sought to obtain information on state legislation, to promote legislation beneficial to state employees and to engage a lobbyist for these purposes.

Mrs. Bauers had distributed organizational materials and legislative reports for IAPES lobbying efforts in the past. She had mailed information to fellow employees and had posted flyers on employee bulletin boards located in Unemployment Offices. She continued to do the same for the Committee. In 1986, the Committee was suc-

* The HONORABLE ROY W. HARPER, United States Senior District Judge for the Eastern District of Missouri, sitting by designation.

cessful in introducing a bill before the Missouri legislature that would have given state merit system employees a right to a hearing when they were transferred from one office to another. Mo.House Bill 1661 (1986) (Bill). The Bill sought to expose supervisor transfer decisions to the light of a public record so that employees might oppose arbitrary transfers based on impermissible criteria.

In February of that year, Mrs. Bauers prepared an informational flyer on her own time and at her own expense. She sought to inform her fellow employees about the existence of the Bill and about Committee efforts on their behalf. She also sought donations to continue the Committee's work. She mailed the flyers and copies of the Bill to employees at other local offices. The flyers·and the attached bill were posted on employee and public-area bulletin boards in these offices. Unemployment Office administrators quickly reacted.

On March 18, 1986, appellee Meystrick, the Assistant Director of Field Operations, sent directives to every local office announcing that no solicitations were to be made at the workplace for any purpose. He attached a memo from appellee Cornett, Director of the Unemployment Office, declaring that use of the initials DES to denote the Committee was improper, and that "subject matter of this type should not be distributed or posted in Division facilities." Plaintiff's Exhibit No. 3.

The district court had difficulty determining whether the Unemployment Office had a general policy against solicitation.

In support of their contention that they did not prohibit Bauers' activities because of the flyer's content, the defendants note that the state has a prohibition against solicitation at state offices. Yet, the pertinent guidelines only limit solicitation of state employees by voluntary agencies by requiring those groups to participate in the Missouri State Employee Charitable Campaign. The DES Lobbyist Committee is not a voluntary agency for purposes of the campaign procedures and, therefore, the guidelines do not apply. The defendants assert that notwithstanding the limited reach of the solicitation guidelines, the Division has a general policy against solicitation of all kinds. The exact bounds of this general policy are not clear.

659 F.Supp. 776, 779 (E.D.Mo.1987).

The court received testimony that while this dispute was pending, managerial employees tried to question appellee Cornett and others about any such policy's scope and meaning. They were not given any "straight answers." Preliminary Injunction Hearing 74, 79 (Nov. 14, 1986) (Record). The court also received evidence that other solicitous memos were sometimes posted on bulletin boards.

Plaintiff also submitted copies of a communication from defendant Cornett notifying Division employees that they could join the Association of Retired Missouri State Employees (ARMSE) as associate members for a small fee. * * * These items include two documents urging DES employees to join the Association of Retired Missouri State Employees (ARMSE) and to support bills the group had sponsored in the Missouri General Assembly.

659 F.Supp. at 779.

Mrs. Bauers removed the Committee flyers and filed suit in federal court seeking equitable relief. During the operation of a temporary restraining order, she posted a second flyer. It contained more information about Committee efforts, a second request for donations, and indicated that money collected would also be used to make campaign contributions to state legislators who supported legislation favorable to public employees.

The district court denied her requests for declaratory and injunctive relief because her solicitations violated the Hatch Act, 5 U.S.C. § 1502(a)(2), "especially since the Committee contemplated that he [the lobbyist] would use some of the funds for political contributions * * *. Consequently, plaintiff's attempts to solicit money from other DES employees on behalf of the DES Lobbyist Committee fell squarely within the prohibitions of the Act." 659 F.Supp. at 780–81. The court believed that the employer's actions were privileged because violations of the Hatch Act by state em-

ployees could lead to a loss of federal funding for the whole division. *Id.* at 781; *see* 5 U.S.C. 1506(a). The district court did not decide whether the employer had a no-solicitation policy, whether such a policy was selectively enforced, or whether any policy could be applied to conduct that did not violate the Hatch Act.[1]

## I. APPLICABLE LAW

### A. The Hatch Act

The "Hatch Act" commonly denotes two laws passed in 1939 and 1940 which restrict the political activities of public employees. One part covers federal employees. 5 U.S.C. § 7321 et seq., 53 Stat. 1147 (Aug. 2, 1939). The second part applies to employees of state and local agencies that receive federal funds. 5 U.S.C. § 1501 et seq., 54 Stat. 767 (July 19, 1940).

The appellees have justified their actions as a necessary response to a violation of the Hatch Act. With respect to employees of state and local agencies that receive federal funding, the Hatch Act provides:

(a) A State or local officer or employee may not—

\*  \*  \*  \*  \*  \*

(2) directly or indirectly coerce, attempt to coerce, command, or advise a State or local officer or employee to pay, lend, or contribute anything of value to a

party, committee, organization, agency, or person for *political purposes;*

5 U.S.C. § 1502(a)(2) (emphasis added), *see also,* 5 C.F.R. 151.121(b) (same).

Federal employees are similarly constrained. *See* 5 U.S.C. § 7323.

The parties disagreed below over the proper interpretation of the term "political purposes." Bauers argued that the Hatch Act only applies to partisan political activity, and that the Committee's activities were nonpartisan. The district court, however, found that the sole purpose of the flyers was to solicit funds,[2] and these funds were to be used for partisan purposes. *Id.* at 778, 80–81.[3]

The district court also proceeded to conclude that, in any event, state employees were prohibited from engaging in various nonpartisan as well as partisan activities, while federal employees were only prohibited from engaging in partisan acts. 659 F.Supp. at 780–81 n. 1 (comparing 5 U.S.C. §§ 1502(a)(2) and 7326(2)). This is the first occasion we are aware of in which a federal court has reached such a conclusion with respect to federal law. We, therefore, pause to consider the scope of the Hatch Act.

### 1. Congressional Intent

The Hatch Act was passed by Congress to address particular forms of political par-

---

1. Although defendants did not question the district court's jurisdiction, we note that a declaratory judgment is permissible only where an actual controversy is present. U.S. Const. art. III, § 2; 28 U.S.C. 2201 (Declaratory Judgment Act). This case presents an actual controversy because Mrs. Bauers wishes to continue to communicate with her fellow workers for the purpose of bettering the conditions of their employment. The defendants seek to deny her specific avenues for so doing. *See Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (plaintiff twice warned to stop distributing handbills); *United Food and Commercial Workers Int'l v. IBP,* 857 F.2d 422 (8th Cir.1988).

2. The district court found that "The writer of the document intended to solicit funds, not advocate ideas. \* \* \* [The first flyer] did not contain any expressive language other than a request for funds." 659 F.Supp. at 780. This is clearly erroneous. The flyers contained information about pending state legislation, even attaching a copy of the Bill. Solicitations neces-

sarily involve advocacy and deserve the full protection of the First Amendment. *Schaumburg v. Citizens for Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826, 838–34, 63 L.Ed.2d 73 (1980).

3. For our convenience, we rely on the Office of Personnel Management's definitions for the following terms:

(e) "Political party" means a National political party, a State political party, and an affiliated organization.

(f) "Election" includes a primary, special, and general election.

(g) "Nonpartisan election" means an election at which none of the candidates is to be nominated or elected as representing a political party any of whose candidates for Presidential elector receives votes in the last preceding election at which Presidential electors were selected.

(h) "Partisan" when used as an adjective refers to a political party.

5 C.F.R. § 151.101 (40 FR 42733, Sept. 16, 1975).

ty corruption and coercion perpetrated by, and victimizing federal, state and local government employees. Recent congressional investigations had revealed that disbursements under New Deal programs were being diverted by the state and local branches of each political party. A special Senate investigation found:

### I.

[T]here has been in several States, and in many forms, unjustifiable political activity in connection with the work of the Works Progress Administration in such States. The committee believes that funds appropriated by the Congress for the relief of those in need and distress have been in many instances diverted from these high purposes to political ends. The committee condemns this conduct and recommends to the Senate that legislation be prepared to make impossible, so far as legislation can do so, further offenses of this character.

### II.

The committee recommends legislation prohibiting contributions for any political purpose whatsoever by any person who is the beneficiary of Federal relief funds or who is engaged in the administration of relief laws of the Federal Government. S.Rep. No. 1, 76th Cong., 1st Sess., pt. 1, at 39 (1939) (Special Committee to Investigate Senatorial Campaign Expenditures and Use of Governments Funds in 1938); *see also*, S.Rep. No. 2, 76th Cong., 1st Sess., pt. 1 (1939) (examples).

Congress did not want the New Deal to serve as a vehicle for the creation of a one-party system in this country or in any state. 83 Cong.Rec. 5400 (April 14, 1938) (remarks of Senator Wheeler and Senator Hatch).

Thus, Congress was concerned with partisan politics. *Id.;* 86 Cong.Rec. 2347 (March 5, 1940) (remarks of Senator Brown). As Senator Hatch explained:

[W]e as legislators * * * are charged with the greater obligation and the greater responsibility * * * to see that under the guise of relieving distress and want and suffering we are not building up our own political strength and our own political machine.

83 Cong.Rec. 7963 (June 2, 1938).[4]

### 2. Judicial Construction

The Hatch Act has been found constitutional insofar as it pertains to partisan po-

---

**4.** Congress assumed that the Hatch Act would prohibit only those solicitations that were for political parties. While Senator Hatch at times declined to commit himself to exact interpretations of the scope of the proposed law, he nevertheless sought to calm the fears of his colleagues by introducing his own summaries of the Civil Service Commission's interpretations of similar executive rules. These summaries indicated that only partisan solicitations were prohibited.

The section provides in substance, among other things, that no such officer or employee shall take any active part in political management or in political campaigns.

The same language of the civil-service rule has been construed as follows:

* * * * * *

Voluntary contributions to campaign committees and organizations are permitted. An employee may not solicit, collect, or receive contributions. Contributions by persons receiving remuneration from funds appropriated for relief purposes are not permitted.

84 Cong.Rec. 11154 (August 5, 1939) (after passage of the first part covering federal employees).

Senator Hatch also introduced a letter from the President of the Civil Service Commission reaching the same conclusion:

DEAR SENATOR HATCH: I am pleased to acknowledge receipt of your letter of July 26, 1939, regarding the interpretation of Senate bill 1871, to prevent pernicious political activities, which has passed both branches of Congress and is now awaiting action by the President.

Section 9 of the enactment reads substantially the same as section 1 of civil-service rule I, and your interpretation of section 9 appears to be the same as the interpretation which the Commission has placed on civil-service rule I. * * *

Section I of civil-service rule I is interpreted to prohibit the following types of political activities on the part of employees in the classified civil service:

* * * * * *

Soliciting campaign contributions (p. 5, sec. 16). The solicitation of political contributions by any person who is in the service of the United States or who is receiving compensation for services from money derived from the Treasury of the United States, regardless

litical activity. In reaching this result, the Supreme Court construed the Hatch Act to apply to only partisan politics:

> It is only partisan political activity that is interdicted. It is active participation in political management and campaigns. Expressions, public or private, on public affairs, personalities and matters of public interest, not an objective of party action, are unrestricted by law so long as the government employee does not direct his activities toward party success.

*United Public Workers v. Mitchell,* 330 U.S. 75, 100, 67 S.Ct. 556, 570, 91 L.Ed. 754 (1947) (federal employees).

"The end sought by Congress through the Hatch Act is better public service by requiring those who administer funds for national needs to abstain from active political partisanship." *Oklahoma v. United States Civil Serv. Comm'n,* 330 U.S. 127, 143, 67 S.Ct. 544, 553, 91 L.Ed. 794 (1947) (state employees).[5]

The Supreme Court has carefully examined the facts of each case involving the political activities of public employees to see if the conduct undertaken was constitutionally prohibitable. In *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), appellants challenged an Oklahoma law modeled after the Hatch Act which prohibited, among other things, solicitation for political purposes. Appellants had violated the law by "actively engaging in partisan political activity." *Id.* at 610, 93 S.Ct. at 2915. The Court rejected appellants' overbreadth claims because their conduct fell within the "hard core of the statute's prescriptions." *Id.* 413 U.S. at 608, 93 S.Ct. at 2914. The Court stated in *dictum:*

> Under the decision in *Letter Carriers,* there is no question that § 818 is valid at least insofar as it forbids classified employees from: soliciting contributions

from partisan candidates, political parties, or other partisan political purposes; becoming members of national, state or local committees of political parties, or officers or committee members in partisan political clubs, or candidates for any paid public office; taking part in the management or affairs of any political party's partisan political campaign; serving as delegates or alternates to caucuses or conventions of political parties; addressing or taking an active part in partisan political rallies or meetings; soliciting votes or assisting voters at the polls or helping in a partisan effort to get voters to the polls; participating in the distribution of partisan campaign literature; initiating or circulating partisan nominating petitions; or riding in caravans for any political party or partisan political candidate.

*Id.* at 616–17, 93 S.Ct. at 2918–19 (footnote omitted).

On the same day, the Court "unhesitatingly reaffirm[ed] the *Mitchell* holding that Congress had, and has, the power to prevent Mr. Poole and others like him from holding a party office, working at the polls and acting as a party paymaster for other party workers. An Act of Congress going no further would in our view unquestionably be valid." *United States Civil Serv. Comm'n v. Letter Carriers,* 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973) (Hatch Act construction). After reciting a list of activities that could be constitutionally regulated, similar to *Broadrick*'s, the Court concluded, "[o]ur judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees." *Id.* See also, *Blaylock v. United States Merit Systems Protection Board,* 851 F.2d 1348 (11th Cir.1988) (construing

---

of whether such person is in the classified civil service or not, from any other such officer or person is a violation of section 118 of the Criminal Code (p. 17, sec. 39, et seq.). *Id.* at 11154–55.

**5.** The Supreme Court had previously upheld laws aimed at political corruption. *See Ex Parte*

*Curtis,* 106 U.S. 371, 375, 1 S.Ct. 381, 385–86, 27 L.Ed. 232 (1882) (sustaining an anti-solicitation law where Curtis had received money for the Republican State Committee of the State of New York to be used in a particular campaign). For factual background, see Petitioner's Brief *Ex Parte Curtis,* exhib. A, pp. 2–4.

these Supreme Court decisions as limited to partisan political activity).

### 3. State Employees and Current Law

Subsequent statutory changes have narrowed even further the reach of the Hatch Act as it applies to state and local employees. Congress amended the Hatch Act the year after the decisions in *Letter Carriers* and *Broadrick*. Until 1974, section 1502 prohibited state and local employees from assuming any active role in political campaigns. 5 U.S.C. § 1502(a)(3). The scope of section 1502(a)(3) was limited by the provisions of section 1503 which permitted nonpartisan political activities. The former text of section 1503 provided:

> Section 1502(a)(3) of this title [political management] does not prohibit political activity in connection with—
>
> (1) an election and the preceding campaign if none of the candidates is to be nominated or elected at that election as representing a party any of whose candidates for presidential elector received votes in the last preceding election at which presidential electors were selected; or
>
> (2) a question which is not specifically identified with a National or State political party.
>
> For the purpose of this section, questions relating to constitutional amendments, referendums, approval of municipal ordinances, and others of a similar character, are deemed not specifically identified with a National or State poltical party. Pub.L. 89–554, Sept. 6, 1966, 80 Stat. 404.

5 U.S.C. § 1503 (1967).

At that time, Civil Service Rules prohibited:

> Directly or indirectly soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose;

5 C.F.R. 151.121(3) (1974, superceded).

In 1974, these sections were changed. Section 1502(a)(3) was amended to remove the prohibition against taking an active part in a campaign, and was replaced with a prohibition only against being a candidate for elective office. Pub.L. 93–443, Federal Election Campaign Act Amendments of 1974. Section 1503 was amended to specifically allow nonpartisan candidacies, where before, to balance section 1502, it had more generally allowed nonpartisan activities. Congress explained its intentions: "Section 401 amends section 1502 ... to provide that State and local officers and employees may take an active part in political management and in political campaigns, except that they may not be candidates for elective office." 11 H.R.Rep. No. 93–1239, 93rd Cong., 2d Sess. 32 (1974) *reprinted in* U.S.Code Cong. & Admin.News 1974, p. 5587. Section 1502(a)(2) prohibiting solicitation of funds for political purposes was not changed.

■ Contrary to the district court's conclusion, the current difference in language between sections 1502 and 7326 does not mean that state employees are more restricted than federal employees in the range of their permissible political activities. The opposite is true. State and local employees may now take an active part in political management or a political campaign so long as they are not themselves candidates. Federal employees still must refrain from active political management or active participation in a campaign. 5 U.S.C. § 7324. This is the understanding of the current Congress.

In 1974 Congress lifted most of the restrictions on political activity by State and local government employees whose positions are funded in whole or in part by Federal moneys. The Federal Election Campaign Act of 1974 (Pub.L. 93–443), amended the Federal Hatch Act as it applied to State and local employees by removing the prohibition against taking an active part in political management or campaigns, but left intact the prohibition against being a candidate for elective office in a partisan election.

*As a result of the 1974 enactment, only three Federal restrictions remain in effect for State and local government employees* whose positions are funded in whole or in part by Federal funds. First, covered employees cannot

use their official authority or influence for the purpose of interfering with or affecting the results of an election or a nomination for office. *Second, covered employees may not directly or indirectly coerce contributions from subordinates in support of a political party or candidate.* Third, such employees may not be candidates for public elective office in a partisan election.

*See,* H.R.Rep. No. 100–376, 100th Cong., 1st Sess., at 11 (1987) (emphasis added); Federal Employees Political Activities Act of 1987 (House Report on Hatch Act Reform).[6]

We find no indication that Congress has at any time intended to restrict the nonpartisan political activities of State or local employees. We interpret the Hatch Act to cover only partisan political activity, that is, activity directed toward the success of a political party.[7] To the extent that the Hatch Act is construed to apply to nonpartisan activities, we would face a constitutional question our courts have avoided for forty years. *See Broadrick v. Oklahoma, supra* (refusal to apply overbreadth analysis to Oklahoma law covering solicitation for "political purposes" where appellants had engaged in partisan activity); *Letter Carriers,* 413 U.S. at 556, 93 S.Ct. at 2886; *Mitchell,* 330 U.S. at 100, 67 S.Ct. at 569–70; *Blaylock,* 851 F.2d at 1357.[8]

## B. Missouri Law

The district court also noted that Mrs. Bauers' conduct violated state law but did not undertake to interpret Missouri law.

---

**6.** A survey of State Attorneys General "found no adverse effects resulting from the [1974] changes in restrictions." House Report on Hatch Act Reform at 11–12.

**7.** We do not decide today whether there may be instances of protected partisan activity because legitimate state interests are insufficient to justify regulation. Nor do we decide what effect selective enforcement may have on our review of subsequent Hatch Act cases. *See* House Report, *supra* at 13; *Federal and Postal Employees' Political Activities Acts of 1987: Hearings on H.R. 20 and H.R. 21 Before the Subcommittee on Civil Service of the Committee on Post Office and Civil Service* 100th Cong., 1st Sess. 15, 112 (1987) (statements of Congressmen Clay and Edwards).

**8.** In the present case, appellees have justified their actions as necessary to avoid a funding cut-off pursuant to 5 U.S.C. § 1506. For the funding of the Unemployment Office to be at risk, federal executive agencies must find a violation of the Hatch Act. In evaluating their position, the appellees should consult administrative interpretations of the Hatch Act.

The Hatch Act was shaped by the adjudications of the Civil Service Commission until departmental reorganization in 1978. 54 Stat. 767 (1940), § 12 (authority to engage in rulemaking and adjudication); Reorganization Plan No. 1 of 1978, 43 F.R. 36037, 92 Stat. 3783, 1978, U.S. Code Cong. & Admin.News p. 9795, transferring the adjudicative functions of the Civil Service Commission to the Merit Systems Protection Board and giving the remaining functions to the Office of Personnel Management. To avoid chilling protected rights, the Hatch Act is construed to constrain only what it clearly prohibits. 5 C.F.R. § 151.111(a); *see also Wilson v. United States Serv. Comm'n,* 136 F.Supp. 104, 106–07 (D.D.C.1955) (a restrictive reading reduces chilling effects on speech caused by uncertainty in the Hatch Act's scope); *Special Counsel v. Chanler Biggs,* 16 M.S.P.R. 355 (1983) (same).

The Civil Service Commission interpreted the Hatch Act to only prohibit partisan political activities. "Thus, any activity under our two party system of a politically partisan nature directed toward the success or failure of either party, or any of its candidates, is generally prohibited by the Act. The Commission has never departed from this standard." *In re Osheim* 2 Political Activity Reporter (P.A.R.) 734, 738 (1966) (state employee; upheld on review, *Osheim v. United States Civil Serv. Comm'n,* 299 F.Supp. 317 (E.D.Wis.1969)). *Accord In re Palmore,* 3 P.A.R. 137, 143 (1972) (state employees); *In re Montgomery,* 3 P.A.R. 45, 47 (1970) (state employee); *In re Martin,* 2 P.A.R. 726, 731 (1965) (state employee; construing prohibitions against federal and state employees as the same); *In re Bollettieri,* 2 P.A.R. 674 (1962) (state employee).

The Office of Personnel Management takes a similar view. *See* House Hearings, *supra* note 7, at 120, 125 (statement of Constance Horner, Director, OPM). *See also,* Fed Facts 2: Political Activity of Federal Employees 3, 5 (OPM, Feb. 1980):

You may be politically active in connection with an issue not specifically identified with a political party, such as a constitutional amendment, referendum, approval of a municipal ordinance, or similar issue.

\*　\*　\*　\*　\*　\*

You may not solicit, receive, collect, handle disburse, or account for assessments, contributions, or other funds for a partisan political purpose or in connection with a partisan election.

659 F.Supp. at 781 n. 2. Missouri law provides:

> No person shall in any manner levy or solicit any financial assistance or subscription for any political party, candidate, political fund, or publication, or for any other *political purpose*, from any employee in a position subject to this law[.]

R.S.Mo. § 36.150.4 (1988 supp.) (emphasis added).

Again we are faced with the task of construing the term "political purpose."

In *Pollard v. Board of Police Comm'rs*, 665 S.W.2d 333 (Mo.1984) (en banc), *cert. denied* 473 U.S. 907, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985), the Missouri Supreme Court sustained the discharge of a police official who had contributed money to a candidate in a party primary for congressional office. Pollard violated a state law prohibiting Kansas City police officers from donating money for "any political purpose whatever." R.S.Mo. § 84.830. This prohibition was part of a larger state effort to eliminate widespread corruption in the Kansas City Police Department. *See generally, id.* at 335–36 (past influence of political parties on hiring and employment). The court sustained Pollard's termination because his contribution to a partisan election fund implicated the clear and compelling objectives of the statute. *Id.* at 341–42.

The lower court had ruled that the statute in question was overbroad because it failed to distinguish between partisan and non-partisan activity. The Missouri Supreme Court declined to adopt this standard because in some cases political parties might play a substantial role in nonpartisan elections. Instead, the court read "political purpose" as only covering activities relating to the election of candidates.

In determining claims of overbreadth, our construction of the statute is definitive and we are obliged to give it a construction which will render it valid, if possible. The statutory language of "political party, political club, or any political purpose whatsoever," with construction aided by the familiar maxims of *ejusdem generis* and *noscitur a sociis*, bespeaks elections at which candidates stand for public office.

*Id.* at 341 (citations omitted) (The constructional principles relied on respectively mean that where general words follow specific ones the general words are limited to the scope of the specific and that a word is generally known by the company it keeps; *see id.* at 341 n. 12 and n. 13.). *Accord Wachsman v. Dallas*, 704 F.2d 160, 169 (5th Cir.) (applying Texas law), *reh. denied*, 710 F.2d 837, *cert. denied*, 464 U.S. 1012, 104 S.Ct. 537, 78 L.Ed.2d 717 (1983).

We think that for the reasons stated in *Pollard*, the Missouri statute applicable to Bauers' conduct should be read as limited to elections where political parties play a substantial enough role that the integrity of the civil service would be compromised absent restrictions on employee participation. Such elections include those where candidates are sponsored by political parties, or where elections are otherwise nonpartisan in name only. *Accord Magill v. Lynch*, 560 F.2d 22 (1977) (interpreting Rhode Island law), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). This construction clearly relates to the state's compelling interests. It also avoids problems of vagueness and overbreadth.[9]

9. Other courts have saved similar state statutes from constitutional infirmity by interpreting "politics" narrowly. *See e.g., Gray v. Toledo*, 323 F.Supp. 1281 (N.D.Ohio 1971) (only partisan activity); *State v. Haley*, 687 P.2d 305 (Alaska 1984) ("politics" does not refer to activity with regard to political causes and issues; it only refers to party activity); *Weaver v. Shaffer*, 290 S.E.2d 244 (W.Va.1980) (partisan activity only); *Hudson v. Gray*, 285 Ala. 546, 234 So.2d 564 (1970) ("politics" does not include petitioning for the passage of an ordinance). *But see Commonwealth v. McCarthy*, 281 Mass. 253, 183 N.E. 495, 85 A.L.R. 1141 (1932).

Some courts have found the term "political purpose" in state statutes unconstitutionally overbroad or vague, and have declined to construct a narrowing reading. *See e.g., Mancuso v. Taft*, 476 F.2d 187 (1st Cir.1973); *Hobbs v. Thompson*, 448 F.2d 456 (5th Cir.1971) (applying Georgia law); *Arden v. Oak Lawn*, 537 F.Supp. 181 (N.D.Ill.1982); *McNea v. Garey*, 434 F.Supp. 95 (N.D.Ohio 1976); *Lecci v. Cahn*, 360 F.Supp. 759 (E.D.N.Y.1973) (vacated on other

## II. BAUERS' CONDUCT

The district court found that Mrs. Bauers intended to solicit funds and that some of the funds would be used for "political contributions." 659 F.Supp. at 780. The funds were to be used to pay a lobbyist and as "campaign contributions."

### A. Statutory Restrictions on Solicitation

█ To the extent Mrs. Bauers attempted to solicit funds for Committee contributions to partisan political campaigns, the Unemployment Office officials properly asked her to remove the solicitations. She clearly was attempting to solicit campaign contributions for legislators willing to back the Bill, who must run in partisan elections. Solicitations for partisan purposes violate the Hatch Act and Missouri law, and are not protected speech under the First and Fourteenth Amendments. *Letter Carriers,* 413 U.S. at 556, 93 S.Ct. at 2886.

█ Absent her request for campaign contributions, Bauers' solicitation of funds from fellow employees to pay for lobbying efforts on behalf of legislation affecting their employment may be protected speech. Neither the Hatch Act nor Missouri law prohibit Mrs. Bauers from soliciting funds for lobbying efforts. The Hatch Act limits only partisan activity, defined as activities which further the success of political parties. *Mitchell,* 330 U.S. at 100, 67 S.Ct. at 569–70; *In re Osheim, supra* n. 8. Public employees are allowed to voluntarily contribute to a fund for lobbying as a public expression of their opinions.

The pertinent discussion in the House also indicates that the House understood that the bill broadened the privilege of expression of opinions beyond the civil service rule, so that such expressions could be made publicly as well as privately, if not part of a political campaign.

\* \* \* \* \* \*

It is my opinion, therefore, in answer to the third question, that the Hatch Act does not restrict persons subject to its terms to a private expression of opinion on political subjects and candidates, but permits a public expression of such an opinion, provided it is not such as to constitute taking an active part in political management or in political campaigns.

40 Op.Att'y Gen. 14 (1941) (Robert H. Jackson). *See also Buckley v. Valeo,* 424 U.S. 1, 22, 96 S.Ct. 612, 636, 46 L.Ed.2d 659 (1976) (contributions are protected as expressions of association).[10] Currently, federal agen-

---

grounds, 493 F.2d 826 (2nd Cir.1974)); *Martin v. State Bd. of Elections,* 119 R.I. 556, 381 A.2d 234 (1977); *Cummings v. Godin,* 119 R.I. 325, 377 A.2d 1071 (1977); *Phillips v. Flint,* 57 Mich. App. 394, 225 N.W.2d 780 (1975); *Stefano v. Wilson,* 96 N.J.Super. 592, 233 A.2d 682 (1967); *Kinnear v. San Francisco,* 61 Cal.2d 341, 38 Cal.Rptr. 631, 392 P.2d 391 (1964); *Fort v. Civil Service Comm'n,* 61 Cal.2d 331, 38 Cal.Rptr. 625, 392 P.2d 385 (1984) (overruled on other grounds *Johnson v. Hamilton,* 15 Cal.3d 461, 125 Cal. Rptr. 129, 541 P.2d 881 (1975)).

**10.** We do not decide today that constitutional limits might constrain a law that sought to go further. Limits on solicitation might deprive Mrs. Bauers of the substance of her speech and associational rights. In *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), Ohio election law made it nearly impossible for alternative political parties to participate in presidential elections. Justice Harlan focused on the effect of Ohio's laws:

It is true that Ohio has not directly limited appellants' right to assemble or discuss public issues or solicit new members. \* \* \* Instead, \* \* \* depriving appellants of much of the substance, if not the form, of their protect-

ed rights. *The right to have one's voice heard and one's views considered by the appropriate governmental authority is at the core of the right of political association. \* \* \* [A] political group has a right to organize effectively so that its position may be heard in court, \* \* \* or in the legislature \* \* \*.*
*Id.* at 41, 96 S.Ct. at 645 (Harlan, J., concurring) (citations omitted). Similarly, curtailing the Committee's ability to raise funds might directly and indirectly injure its members' First Amendment rights:

[Regulation] must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps, persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease.

*Schaumburg,* 444 U.S. at 632, 100 S.Ct. at 834. *See also Healy v. James,* 408 U.S. 169, 181–83, 92 S.Ct. 2338, 2346–47, 33 L.Ed.2d 266 (1972) (even if student organization could continue to operate without access to university facilities, a court must examine the practical realities of the

cies allow unions to post solicitations for their political committees.[11]

Similarly, Missouri law does not prohibit solicitations for lobbying absent a tangible connection to party activity surrounding elections. *Pollard, supra.* A Missouri court may well strike down a political activity law not susceptible of a limiting construction. *See Ferguson Police Officers Association v. City of Ferguson*, 670 S.W. 2d 921 (Mo.App.1984).

In this case, however, the district court was faced with a solicitation for funds with the combined purpose being to pay the expenses of the lobbyists, an allowable goal under the Hatch Act, but also to put funds into the hands of the lobbyists for the purpose of making political contributions to legislators selected in partisan elections. The district court did not err in its decision finding that the state properly prohibited such mixed contributions.

### B. Workplace Restrictions

██ The First Amendment allows restrictions on speech where the employer-employee relation might be compromised or where the speaker wishes to communicate on public property. On remand, the district court will have to determine whether the employer's position can be justified in either of these ways.[12]

### C. Use of the Designation "D.E.S."

Lastly, the district court held that the Committee could not call itself the "D.E.S. Lobbyist Committee" because this designation might confuse legislators and the public as to who the Committee represents. The district court balanced the state's interest in preventing this impression against the burden to the Committee of changing its name and concluded that the state's interest should prevail.

We affirm the district court's denial of declaratory relief permitting the continued use of the initials by the Committee. Under *Pickering, supra* note 11, restrictions necessary to prevent actual interference with the operations of the Unemployment Office may be valid. While, no doubt, the Committee may make some reference to where they work in their name or during their efforts, we do not quarrel with the district court's finding that the name "Division of Employment Security Lobbyist Committee" is misleading as is.

### CONCLUSION

We hold that federal and state law prohibits covered employees from soliciting partisan campaign contributions from other covered employees. We affirm the denial of declaratory relief protecting further postings which constitute statutory violations. We also affirm the district court's conclusion that the Committee may not continue using the initials D.E.S. in the same manner it did in the original flyer. We feel it advisable, however, to remand this case to the district court for further consideration of whether some relief can be crafted that will allow solicitations for lawful purposes. Solicitations to fund lobbying efforts are not prohibited by the Hatch Act or Missouri law. Absent a legally sustainable departmental policy to the contrary,

---

disability imposed to decide if associational freedoms are injured).

**11.** Congress is aware of and approves of this practice:

Currently, many Federal agencies make bulletin boards available to Federal employee unions on which items of interest to the union members may be posted. One of the items usually posted on these bulletin boards is the union newsletter. Frequently, union newsletters contain a solicitation for members to contribute to the political committee of the union. * * * [T]he committee intends that the posting of union newsletters on bulletin boards, which has been allowed under existing law, continue to be allowed.

House Report on Hatch Act Reform, *supra* at 18.

**12.** We do not address this matter further, except to say that the following cases are instructive. *Cornelius v. NAACP Legal Defense & Ed. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985); *Perry Ed. Assn. v. Perry Local Ed. Assn.,* 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983); *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Roberts v. Van Buren Public Schools,* 773 F.2d 949 (8th Cir.1985); *Bowman v. Pulaski County Special School Dist.,* 723 F.2d 640 (8th Cir.1983); and *Smith v. United States,* 502 F.2d 512 (5th Cir.1974).

employees may solicit funds for nonpartisan purposes from fellow employees. Such purposes include the seeking of contributions for lobbying efforts aimed at promoting employee interests.

The relief fashioned by the district court must clearly delineate those purposes that are lawful from those that are unlawful. The court did not err in denying declaratory relief where the purpose was mixed. We recognize the difficulties that may be presented in separating the lawful from unlawful contributions, particularly when it will be dependent upon the manner in which lobbyists handle money paid to them. We are satisfied that this inquiry is best left initially to the district court.